788 S.W.2d 849 (1990)
C---- E---- J----, Appellant,
v.
The STATE of Texas, Appellee.
No. 05-88-01040-CV.
Court of Appeals of Texas, Dallas.
March 8, 1990.
Rehearing Denied April 26, 1990.
*850 Maridell Templeton, Garland, for appellant.
Jeffrey B. Keck, Dallas, for appellee.
Before STEWART, BAKER and KINKEADE, JJ.

OPINION
STEWART, Justice.
C.E.J., a minor, was convicted by a jury in the juvenile court of Dallas County for the offense of capital murder and committed to the Texas Youth Commission for thirty years with a transfer to the Texas Department of Corrections at age eighteen, pursuant to section 54.04(d)(3) of the Texas Family Code. C.E.J. appeals and asserts eight points of error as grounds for reversal. In his first, second, and third points, C.E.J. complains that his disposition judgment is void because sections 53.045 and 54.04(d)(3) of the Texas Family Code denied him due process and equal protection of the law and required him to answer for a criminal offense not based on an indictment by the grand jury in violation of the United States and Texas constitutions. In his fourth and fifth points, C.E.J. complains that the trial court erred in not suppressing his confession and the fruit thereof because he was not adequately warned of the *851 consequences of making the statement and because the confession was the result of an illegal arrest. Finally, in his sixth, seventh, and eighth points, respectively, C.E.J. complains that he was denied effective assistance of counsel, that he was denied equal protection due to the systematic exclusion of blacks from the jury by the State, and that the trial court erred in not sustaining his objections to improper prosecutorial argument. Because we find that C.E.J.'s seventh point concerning the State's systematic exclusion of blacks from the jury is dispositive of this appeal, we do not reach his other points. See Smith v. State, 658 S.W.2d 172, 174 (Tex.Crim.App. 1983) (constitutionality of a statute not determined unless absolutely necessary to decide the case in which the issue is raised). We reverse the judgment of the trial court and remand the cause for a new trial.
A recitation of the underlying facts giving rise to the charges brought against C.E.J. is necessary since the State relies on them to support its use of peremptory challenges. The facts adduced at trial, viewed in the light most favorable to the verdict, are as follows. See Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979); Girard v. State, 631 S.W.2d 162, 163 (Tex.Crim.App.1982).
C.E.J., a fourteen-year-old, and Timothy Poole, a nineteen-year-old, went to the home of Lexine Robinson. Timothy had dated Yolanda Foster, Lexine's seventeen-year-old daughter, until Lexine terminated the relationship because she thought that Timothy was a bad influence on Yolanda. Lexine and Timothy began to argue when Timothy said that he wanted to start dating Yolanda again. During the argument, C.E.J. went to the rear of the house, took a .25 caliber pistol from Lexine's purse, returned to the living room, helped Timothy disrobe Lexine, and watched Timothy sexually assault her; C.E.J. also attempted to sexually assault Lexine, but he was unable to effect penetration. Timothy then stabbed Lexine to death on the living room floor with a knife that C.E.J. had found in the kitchen and told C.E.J. to help him drag Lexine's body to a back bedroom, where they covered it with bedding.
C.E.J. took the keys to Lexine's van, and he and Timothy drove around the neighborhood. They saw Michael Bernard Robinson, Lexine's son, and gave him a ride. Michael later became upset and began yelling that he wanted to go home, so C.E.J. shot him with the pistol to "quiet him down." Michael then escaped from the van and ran into a nearby house, where he was caught by Timothy, brought back to the van, returned to the Robinson house, and forced inside. Michael ran to the back of the house, and C.E.J. pursued him, stabbed him twice, and returned to the living room to tell Timothy that he had stabbed Michael, at which time Timothy went to the back bedroom and shot Michael in the back of the head.
Shortly thereafter, Yolanda arrived home from school with Travonda Campbell, a friend from school, and C.E.J. and Timothy dragged them into the kitchen. C.E.J. and Timothy later forced Yolanda and Travonda into the van. Travonda was released near her home, and C.E.J. walked home. Travonda told her cousin what had happened and notified the police.
The next day, Dallas Patrol Officer Nancy Felix pursued the Robinson van in a high speed chase until the van, driven by Timothy, collided with another vehicle. The body of Yolanda, who had been shot in the back of the head, and Lexine's .25 caliber pistol were discovered in the van. Dallas Police Officer W.J. Marks went to the scene of the collision, saw Timothy, and remembered that he had seen Timothy with C.E.J. near the Robinson house the previous day shortly before the time that the murders of Lexine and Michael were estimated to have occurred.
Later that day, Officer Marks found C.E.J., who accompanied him to the Youth Detention Offices of the Dallas Police Department to be questioned by homicide detectives. Officer Jack Allison was questioning C.E.J. when he noticed what appeared to be dried blood on C.E.J.'s tennis shoes. When C.E.J. told Officer Allison that the red substance was ketchup, Officer Allison said that the substance looked *852 like dried blood and that he was going to have the tennis shoes analyzed. Thereafter, C.E.J. orally admitted his involvement in the murders of Lexine and Michael to investigators and was warned by Judge Victor Ortiz pursuant to section 51.09 of the Texas Family Code. C.E.J. later gave a written confession, at which time Magistrate Joe H. Loving, Jr., out of the presence of investigators, discussed the statement with C.E.J. and certified that the statement was voluntary.
In his seventh point, C.E.J. complains that he was denied equal protection of the law due to the systematic exclusion of blacks from the jury by the State. Specifically, C.E.J. argues that the trial court erred in finding that the State had rebutted his prima facie showing of racial discrimination by providing racially neutral reasons for striking five black veniremembers. The State replies that Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), does not apply in civil cases, that C.E.J. failed to preserve his complaint for appellate review by timely objection at trial, and that the trial court correctly found that the State had rebutted C.E.J.'s prima facie case of racial discrimination by providing race-neutral reasons for striking blacks from the venire.
We must initially determine whether the dictates of Batson apply to juvenile delinquency trials. We have found no authority, nor has appellant cited any, addressing this issue. Hence, we agree with the State that this question is one of first impression in this State.
In Batson, the Supreme Court held that in the criminal trial of an adult, the State's privilege to strike individual jurors through peremptory challenges is subject to the commands of the Equal Protection Clause of the Fourteenth Amendment and that this clause forbids the prosecutor to challenge potential jurors solely on account of their race or the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant. Id. at 89, 106 S.Ct. at 1719. Thus, under Batson, an adult black defendant has the constitutional right to a petit jury which is selected without discrimination on account of race. Id. at 88, 106 S.Ct. at 1718.
Although a juvenile delinquency trial is a civil proceeding, it is quasi-criminal in nature. Smith v. Rankin, 661 S.W.2d 152, 153 (Tex.App.Houston [1st Dist.] 1983, no pet.) (orig. proceeding). The juvenile is guaranteed all the constitutional rights which he would have as an adult in a criminal proceeding, because the juvenile delinquency procedures seek to deprive him of his liberty. Id. He is even afforded additional rights to those enjoyed by an adult. Ex parte Menefee, 561 S.W.2d 822, 829 (Tex.Crim.App.1977). Further, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone. In Re Gault, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1969).
Accordingly, we hold that, because Batson establishes a constitutional right that a black juvenile would have as an adult in a criminal trial, its dictates do apply to a juvenile delinquency proceeding involving a black juvenile. We reject the State's first contention.
The State next argues that C.E.J.'s Batson objection was not timely because he did not object to the exercise of the State's peremptory challenges until the day after the list of twelve jurors was called and the remaining veniremembers were excused from further service. Henry v. State, 729 S.W.2d 732, 737 (Tex.Crim.App. 1987) (timely Batson objection made before jury is sworn and the venire panel is discharged). This Court recently has held that Henry no longer governs the timeliness of a Batson challenge in an adult's trial. Hill v. State, 787 S.W.2d 74 (Tex. App.Dallas 1990) (opinion on motion for rehearing).
Following the decision in Henry, the legislature enacted article 35.261 of the Texas Code of Criminal Procedure, which provides in pertinent part:
(a) After the parties have delivered their lists to the clerk ... and before the court has impanelled the jury, the appellant may request the court to dismiss the *853 array and call a new array in the case....
(b) If the court determines that the attorney representing the state challenged prospective jurors on the basis of race, the court shall call a new array in the case.
We recognize that the Texas Court of Criminal Appeals has held that the provisions of the Texas Code of Criminal Procedure do not apply to delinquency proceedings. Robinson v. State, 707 S.W.2d 47, 49 (Tex.Crim.App.1986). Thus, the provisions of article 35.261 are not controlling in this case. However, the Legislature enacted article 35.261 to implement the Batson decision. State ex rel. Sheen v. Tunnell, 768 S.W.2d 765, 768 (Tex.App.Tyler 1989, no pet.). Consequently, in the absence of legislation implementing the Batson decision in delinquency trials, we adopt the relevant provisions of article 35.261, and the case law interpreting it, as our standard of review to determine the timeliness of a Batson motion in this juvenile delinquency proceeding.
Under article 35.261, an objection, to be timely, must be made "before the court has impanelled the jury." Impanelment by the court is not complete until those who are chosen to serve on the jury have been both selected and sworn. Hill, at 77. See also Woolls v. State, 665 S.W.2d 455, 467 (Tex.Crim.App.1983), cert. denied, 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 889 (1984) (jury not impanelled until sworn as a body); B. Garner, A Dictionary of Modern Legal Usage 221 (1987). The State acknowledges and the record reflects that C.E.J. raised his Batson objection before the jurors were sworn. We conclude that, pursuant to this Court's decision in Hill and section 35.261 of the Texas Code of Criminal Procedure, C.E.J.'s Batson challenge was timely and, thus, we will consider the merits of his claim.
To invoke the protection of Batson, a defendant must raise an inference of purposeful discrimination and the trial court must determine that a prima facie case of discrimination exists by virtue of the State's use of its peremptory challenges. A defendant may establish a prima facie case of discrimination by showing:
1. that he is a member of a cognizable racial group;
2. that the prosecutor has exercised peremptory challenges to remove members of the defendant's race from the venire; and
3. these facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude the veniremembers on account of their race.
Batson, 476 U.S. at 96, 106 S.Ct. at 1723; Keeton v. State, 724 S.W.2d 58, 65 (Tex. Crim.App.1987) (Keeton I); see also Tex. Code Crim.Proc.Ann. art. 35.261(a) (Vernon 1989). The record reflects that the venire consisted of twenty-seven females and seventeen males; after nine challenges for cause were granted, none of which affected black veniremembers, twenty-two female and thirteen male veniremembers remained. Of the thirty-five remaining, there were seven black females and one black male. The State used all ten of its peremptory strikes on females (five whites and five blacks). Appellant struck an additional black female, and, although neither side struck the seventh, she was not reached for service as a juror. The jury consisted of nine males, eight white and one black, and three females, all of whom were white.
The day following voir dire, before the jurors were sworn, the defense made the following objection:
[DEFENSE COUNSEL]: ... through this jury selection, mindful of the [Batson] case, I submit the State violated the dictates of the Supreme Court in the [Batson] case ... because I submit that the State selectively discriminated against members of a particular race in striking this jury.
The jury is comprised of, I believe, eight black people. Six black women were struck by the State: Margarette *854 Galloway, Sandra Alford, Vicky[1] Hodges, Cynthia Criss, Marilyn Hopkins, and Betty Joyce Mott.[2] Your Honor, since sixty percent[3] of the State's strikes were utilized on members of a particular race, black females, I submit there is no way in the world that was anything but a discriminatory exercise of the State's peremptory challenges ... A particular race has been selectively struck, and judging by the answers and responses of the jury as a whole, there is nothing that can be gleaned from thisnothing that can be concluded in that the Stateby the responses to the jury, the State cannot give a particular reason as to why each black woman was struck from the jury other than for racial reasons, because jurors with the same characteristics other than their race were not struck by the State.
* * * * * *
Therefore, I submit, Your Honor, that I have made a prima facie showing of discrimination in the jury selection process....
* * * * * *
THE COURT: Are you requesting a hearing, [defense counsel]?
[DEFENSE COUNSEL]: I am requesting a hearing.
THE COURT: Do you intend to tell us what race your client is a member of?
[DEFENSE COUNSEL]: My client is a member of the black race.
* * * * * *
THE COURT: [PROSECUTOR].
[PROSECUTOR]: Yes. Judge, we deny that there was any systematic exclusion of any black jurors. We have a black juror on our jury panel
[DEFENSE COUNSEL]: Your Honor, that
THE COURT: [Defense counsel] let [the prosecutor] make his argument, please.
[PROSECUTOR]: If the court is going to require a hearing be held, then we'll have to have somebody to identify what race each juror was, because I have no way of knowing. All of the jurors, basically, that I struck, potential jurors, were females, and that was part of our purpose.
The trial judge then identified for the record the six black females that defense counsel had named previously, stated that she was going to give defense counsel his hearing, and recessed court to give the prosecutor time to review his notes about his peremptory strikes. Thus, the court impliedly ruled that C.E.J. had established a prima facie case of discrimination by the State in its use of its peremptory strikes. The State does not contend otherwise.
After the recess the State gave the following explanations for its strikes of the five black females.
[PROSECUTOR]: ... starting with number four, Galloway, first of all, the panel was made up of twenty-seven females and seventeen males. After consulting with Ms. Warder, who is lead counsel in this case, we felt that because of the facts in this case we wanted a makeup of sex of at least as many males as females, if not a few more. So, therefore, because of the weighted factor toward females, females were a first consideration in striking someone.
Concerning Ms. [Margarette] Galloway, she was obviously a woman; she was divorced, she is a teacher, and we felt that because of the juvenile proceedings and the facts in this case we did not want a teacher. She also knew the aunt of [C.E.J.] from a church affiliation. So, therefore, those are the reasons she was struck.
* * * * * *
Sandra Sue Alford, number nine, she also indicated on voir dire that she knew about the case from the paper, and I really couldn't determine in her answer to that, there wasn't any follow-up as to *855 what she felt about that. Also, during voir dire, there was really no eye contact with myself during voir dire, and I did not think that she was giving me attention that should have been given.
Number eighteen, Cynthia Criss; Ms. Criss also did not give me eye contact; she was not paying attention on several parts of the voir dire; and not paying attention on voir dire, I did not believe she would be a good juror in this case based upon the facts.
Number thirty, Marilyn Wilson Hopkins; she knew the aunt of [C.E.J.], and in fact on voir dire questioning she stated she could not be a fair and impartial juror because of her relationship with the aunt, who on voir dire she testified that she was a patient of theirs in a doctor's office ... She was brought up before the bench and explained before the bench that she thought she could be fair; however, I did not want to take that chance, and that's the biggest reason she was struck. She also was a single person with no children.
Number forty-one, Mott; I didn't strike Mott; the reason Mott was struck [sic] was because of the strike pattern of [C.E.J.'s] counsel. [C.E.J.'s] counsel struck number forty-two and number forty-three. If [C.E.J.'s] counsel had struck anyone previous to that, we would have had Ms. Mott on the panelon the jury.
It was then determined that no one struck Ms. Mott, juror number forty-one, and that the last juror to serve was number forty. The court then asked if there was another juror, and the prosecutor responded:
[PROSECUTOR]: Yes, Number thirteen; I got a little out of numerical sequence; Vick[y] Ann Hodges; she was also not paying attention on voir dire and she did not have any children, and [we] didn't want those considerations on the jury.
The court then allowed defense counsel to cross-examine the prosecutor, after which defense counsel stated that the defense had shown three people who were excluded because of race, Ms. Alford, Ms. Criss, and Ms. Hodges, and that the State could not "give any suitable reason that would distinguish them from anybody else." The trial court found that the prosecution had been able to provide neutral, reasonable explanations for its peremptory strikes and denied defense counsel's "motion to quash the jury."
In reviewing the trial court's decision, we must consider the evidence in the light most favorable to the trial judge's rulings and determine whether those rulings are supported by sufficient evidence. If the record supports the trial court's findings, we will not disturb those findings on appeal. Keeton v. State, 749 S.W.2d 861, 870 (Tex.Crim.App.1988) (Keeton II.) However, the trial judge must examine each of the prosecutor's reasons for striking a potential black juror within the circumstances of the particular case to determine whether the "neutral explanation" for the strike is really a pretext for a racially motivated peremptory challenge. Id. at 868. In making this determination, the trial judge must ascertain whether the prosecutor has articulated a "clear and reasonably specific" explanation of "legitimate reasons" for striking the black veniremember. Batson, 476 U.S. at 97-98, 98 n. 20, 106 S.Ct. at 1723-1724, 1724 n. 20. As explained in Keeton II:
The trial judge cannot merely accept the specific reasons given by the prosecutor at face value, the judge must consider whether the facially neutral explanations are contrived to avoid admitting acts of group discrimination. This evaluation by the trial judge is necessary because it is possible that an attorney, although not intentionally discriminating, may try to find reasons other than race to challenge a black juror, when race may be his primary factor in deciding to strike the juror.
Keeton II, 749 S.W.2d at 868.
On the other hand, once the prosecutor has given a racially neutral explanation that is legally adequate to support a judgment in favor of the State, an issue of fact is joined which can only be resolved by the trial court's assessment of evidentiary weight and credibility. Tompkins v. State, 774 S.W.2d 195, 202 (Tex.Crim.App.1987), *856 aff'd, ___ U.S. ___, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989). The accused has the burden "to persuade the trial judge by a preponderance of the evidence that the allegations of purposeful discrimination are true in fact." Id.
With these principles in mind, we now review the trial court's determination that the prosecutors did not use peremptory strikes solely to exclude members of C.E. J.'s race from service on the jury in this case. Because defense counsel ultimately argued that the defense had proved that the State had excluded Alford, Criss, and Hodges because of race, we focus our review on the State's use of its peremptory strikes against these three jurors. The State's first reason for striking these three black veniremembers was that they were female. The prosecutor testified that because of "the facts in this case," the State wanted at least as many males as females, if not more males, on the jury, and, because the panel was composed of twenty-seven females and seventeen males,[4] "females were a first consideration in striking someone." Consistent with this reason, the State used all ten of its strikes on women. First, we note that the State never gave any explanation of how or why the facts of the case made it want an equal mix of the sexes, or perhaps more males, on the jury. Thus, the State failed to establish any reason why females as a group would impact negatively on the State's case. In addition, although the defense never challenged this gender-based reason per se, it did establish that the State struck five out of seven of the black female veniremembers. The defense also brought out that a disproportionate percentage of black women were struck over the percentage of white women struck. Under these facts, we conclude that the State failed to give a clear and reasonably specific explanation for the use of gender as a basis for its strikes of black veniremembers. Because of this failure and because of appellant's rebuttal evidence, we further conclude that appellant met his burden to prove by a preponderance of the evidence that the State's "neutral explanation" of gender for these strikes was really a pretext for racially motivated peremptory challenges. Keeton II, 749 S.W.2d at 868. Thus, we must also review the other reasons given by the State for striking Alford, Hodges, and Criss to determine whether there is sufficient evidence in the record to support the trial court's findings.
The State gave the following reasons for striking Alford: she was divorced, she was not paying attention, and she had read about the case in the newspapers. A prospective juror is subject to being excused if he or she has a bias or prejudice against the accused or has formed a conclusion as to the guilt of the accused that could influence his or her decision. See, e.g., Barber v. State, 737 S.W.2d 824, 829 (Tex.Crim.App.1987). Although Alford stated that her previous knowledge would not affect her decision in the case, the fact that she had read about the case constituted a legitimate, trial-related explanation for striking her. Thus, the record supports the trial court's finding that the State articulated a clear and specific race-neutral reason for striking Alford.
The State's reasons for striking Hodges were that she had no children and she was not paying attention on voir dire. We address the lack of children factor first. On cross-examination by defense counsel, the prosecutor acknowledged that five white veniremembers who were not struck and who ultimately became jurors also did not have children. Evidence of disparate treatment of a juror, i.e., when persons with the same or similar characteristics as the challenged juror are not struck, weighs heavily against the legitimacy of a racially neutral explanation given by the State. Keeton II, 749 S.W.2d at 868. We hold that by eliciting the above facts, C.E.J. met his burden to prove by a preponderance of the evidence that the State's use of lack of children as a reason to strike Hodges was a sham or pretext.
*857 Next, the State testified that it struck Hodges because she was not paying attention to the voir dire proceedings. A veniremember's inattentiveness may be a sufficiently race-neutral reason to justify the use of a peremptory strike. Daniels v. State, 768 S.W.2d 314, 317 (Tex.App.Tyler 1988, pet. ref'd). No problem is presented when the veniremember's indifference to the proceedings is unmistakable. See, e.g., U.S. v. Ratcliff, 806 F.2d 1253 (5th Cir.1986), cert. denied, 481 U.S. 1004, 107 S.Ct. 1625, 95 L.Ed.2d 199 (1987) (use of peremptory challenge against a black female who slept during jury selection); People v. Moss, 188 Cal.App.3d 268, 233 Cal.Rptr. 153 (1986) (peremptory challenge allowed for inattentiveness because, among other things, the juror was reading a newspaper during voir dire). During defense counsel's cross-examination in this case, the prosecutor testified that he could not recall whether he had directed any questions to Hodges. The record reflects that the only question asked of Hodges was by defense counsel regarding whether she could consider probation if she were to find C.E.J. guilty of capital murder; she answered affirmatively. In the absence of any direct effort by the prosecutor to engage Hodges' attention with individual questions, it is natural to suspect that neither the prosecutor's nor the judge's attention was sufficiently focused on her to permit them to fairly assess or judge her attentiveness. Daniels, 768 S.W.2d at 317. We do not hold that a veniremember's demeanor can never be a racially neutral motive for the State's peremptory challenge. We do conclude that the protection of the constitutional guarantees of Batson requires trial courts to scrutinize elusive, intangible, and easily contrived explanations with a healthy skepticism. Id. Otherwise, inattentiveness, for example, will inevitably serve as a convenient talisman transforming Batson's protection against racial discrimination in jury selection into an illusion and the Batson hearing into an empty ceremony. Id.
The State offered no objective proof of Hodges' inattentiveness. It asked no questions of her, and the defense's examination of her does not support her inattentiveness.
No examination or only a perfunctory examination of the challenged juror by the State weighs heavily against the legitimacy of a facially race-neutral explanation and may illustrate sham or pretext. Keeton II, 749 S.W.2d at 869 (elusive, intangible explanation not coupled with objectively verifiable reason is suspect). Here, unverifiable lack of attentiveness, coupled with a reason shown to constitute disparate treatment, is strong evidence of a sham or pretext. Under these facts, we hold that the State's explanation of inattentiveness is not a plausible, racially neutral reason to overcome C.E.J.'s prima facie showing of purposeful discrimination against Hodges. Daniels, 768 S.W.2d at 318.
The prosecutor testified that Criss was struck because she was not paying attention on voir dire and because of her lack of eye contact with the prosecutor. The record reflects the same facts regarding Criss as those regarding Hodges on inattentiveness: the State asked her no individual questions; the defense asked only if she could consider probation if she were to find C.E.J. guilty of capital murder, and she answered affirmatively. Likewise, Criss's lack of attentiveness is not supported by any objective proof. Further, it is not coupled with an objectively verifiable reason, because, as we discuss infra, the only other reason for striking her, lack of eye contact, is also an elusive, intangible reason. Under the rationale and authority discussed concerning this issue as to Hodges, the State has not provided sufficient evidence that Criss's alleged inattentiveness is a plausible, racially neutral reason to overcome C.E.J.'s prima facie showing of purposeful discrimination against her. Id.
Finally, the State explained that it struck Criss because she had no eye contact with the prosecutor during the voir dire proceedings. This explanation, like the explanation of inattentiveness discussed above, is of the type least susceptible to objective evaluation and, therefore, most ripe for abuse and subterfuge. Branch v. State, 774 S.W.2d 781, 782 (Tex. App.El Paso 1989, pet. ref'd). While not every strike based on such an explanation can be summarily disbelieved, it merits *858 closer scrutiny under the criteria suggested in Keeton II.
The record reflects that the prosecutor noted lack of eye contact regarding only two jurors, both of whom were black and both of whom were struck by the State: Alford and Criss. As to Alford, this reason was coupled with an objectively verifiable reason, that she knew about the case from reading the paper. Consequently, this combination of reasons is racially neutral and sufficient to support Alford's exclusion. Keeton II, 749 S.W.2d at 869. However, as to Criss, lack of eye contact is coupled only with her lack of attentiveness, which we have held is not objectively verifiable under this record. Thus, lack of eye contact is not coupled with an objectively verifiable reason. Moreover, the State's failure to examine Criss in itself weighs heavily against a facially neutral explanation. Id. at 868. When that explanation is based on nonverbal behavior, such as lack of eye contact, the significance of which, as here, the State has made no attempt to determine or explain, the record reflects even stronger evidence that the reason asserted is a sham or pretext. Under these facts we hold that the State's explanation of lack of eye contact is not a plausible, racially neutral reason to support Criss's exclusion.
For the foregoing reasons, we hold that there is insufficient evidence in the record to support the trial court's findings that the State gave racially neutral explanations for striking Hodges and Criss. The exclusion of even one member of C.E.J.'s race from the jury for racial reasons invalidates the entire jury selection process and requires reversal. See Batson, 476 U.S. at 100, 106 S.Ct. at 1725 (purposeful discrimination requires a reversal); Keeton II, 749 S.W.2d at 871 n. 1 (Teague, J., concurring); Henry v. State, 729 S.W.2d 732, 734 (Crim. App.1987); Keeton I, 724 S.W.2d at 65 n. 5.
The judgment of the trial court is reversed, and the cause is remanded for a new trial.
NOTES
[1] We note that the record also reflects Vicky spelled as Vickie.
[2] Betty Joyce Mott was not reached for service on the jury because of her position on the panel.
[3] Fifty, not sixty, percent of the State's peremptory strikes were used on black females. See fn. 2.
[4] This was the gender composition of the original panel. As stated above, after challenges for cause were granted, the remaining panel consisted of twenty-two females and thirteen males.