Affirmed and Memorandum Opinion filed March 6, 2007








Affirmed and Memorandum Opinion filed March 6, 2007.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00867-CR

____________

 

CLIFTON LEVON PORCHER, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 232nd
District Court

Harris County, Texas

Trial Court Cause No. 991,386

 



 

M E M O R A N D U M   O P I N I O N

This is a capital murder case in which appellant, Clifton
Levon Porcher, challenges his conviction by contending in thirteen appellate
issues that (1) he received ineffective assistance of counsel; (2) the trial
court erred in denying his objection to the State=s use of
peremptory strikes on two potential jurors; and (3) the trial court erred in
various evidentiary rulings.  We affirm. 








I.  Factual and Procedural
Background

In October of 2002, Tyrone Jones approached his roommate,
Romalius Mathews, with a request to purchase a kilogram of cocaine.  Mathews
had the ability to purchase this cocaine from his longtime friend and
associate, the complainant, Andre Merriweather, with whom Mathews had engaged
in other narcotics transactions.  Jones provided Mathews with $17,000 to
purchase the cocaine.  On October 16, 2002, immediately after receiving the
cash, Mathews contacted Merriweather to arrange for the Aexchange@ to occur later
that evening at a McDonalds restaurant.

In the meantime,  Mathews came up with a plan to steal the
purchase money back from Merriweather after the two had completed the cocaine
transaction.  Mathews discussed this plan with Jones, and they contacted Lee
Washington, who was the leader of a gang known as Athe Fam@ or Athe Family.@[1]  The plan, as
developed by Mathews, was for Mathews to meet Merriweather alone and pay him
$16,200.00 in exchange for one kilogram of cocaine. Mathews suspected that
Merriweather would drive to a night club after the transaction and leave the
money in his car.  According to Mathews=s plan, someone
else would follow Merriweather to the club and then break into Merriweather=s car through the
window and steal the money. Washington called appellant, who agreed to be the
accomplice in Mathews=s plan.      

Washington and appellant met Mathews at a grocery store
near the McDonalds where Mathews and Merriweather were to conduct the cocaine
transaction later that evening.  All three men sat in appellant=s truck while
Mathews explained his plan to appellant.  Mathews, surprised at seeing
appellant loading a Glock gun, told appellant that a gun was not necessary
because Merriweather did not carry a gun.  Appellant replied, Ayou never know what
might happen.@  Mathews then left the grocery store and drove to the
McDonalds in his car while Washington and appellant drove to a Race Track gas
station located next to the McDonalds. 








Soon thereafter, Merriweather arrived in a silver Mercedes
sports utility vehicle (ASUV@) and parked next
to Mathews.  Mathews retrieved the box of money out of his own car and got into
Merriweather=s SUV to make the exchange.  While they were
completing the transaction, a man approached the driver=s side of
Merriweather=s vehicle and hit the window with the back of his
weapon. Mathews, who was sitting in the passenger seat, immediately looked up
and saw appellant.  Merriweather, who was sitting in the driver=s seat, jumped
into Mathews=s lap, just as appellant lifted his weapon and fired
through the driver=s side window. Mathews, in the passenger
seat, felt glass and blood-splatter hit him.  Then, after hearing another gun
shot, Mathews heard Merriweather say, Aouch.@  

At the time of the shooting, Merriweather=s vehicle was not
in the Apark@ position. 
Consequently, after he was shot, his foot fell off the break, and the SUV,
still in gear, spun backwards in a circular motion.  The passenger side door
flew open, and Mathews was thrown from the vehicle, and landed in the grass
near the parking lot.  From there Matthews could see the SUV collide with other
vehicles in the parking lot.  When the vehicle finally came to a stop,
appellant ran to the SUV, dove through the window, and fired more shots (at
least two or three) into Merriweather.  Appellant was thrown backward when the
SUV moved forward.  Appellant then went back to the SUV, looked in the driver=s side window, and
fled the scene.  Mathews went to the SUV to check on Merriweather, and found
him still alive.  He pulled Merriweather from the SUV and held Merriweather=s head on his lap.
Merriweather died within minutes.

Meanwhile, Dierdra Castilow, a customer in the McDonalds
drive-through lane, had witnessed the event.  After the shooting, she saw a man
walk up to the SUV and reach in and retrieve something.  She described him as
being clad in dark clothes, with a hood on his head, and his hands in his
pockets.  She also saw a white Avalanche vehicle parked at the McDonalds, and
when the hooded man approached the vehicle, it took off.  The hooded man then
fled into a wooded area. 








Castilow left the McDonalds and drove to the Race Track gas
station.  On the way, she saw what she thought was the white Avalanche parked
by some trailers, and someone walking out of the bushes toward this vehicle. 
She then returned to the McDonalds and considered administering cardiac
pulmonary resuscitation to Merriweather, but decided against it when she saw
smoke coming from the bullet wounds in his chest.  Although Castilow could not
identify the man who took the items from the SUV, she testified that he was a
black man with a slim build.  Her passenger and companion that evening,
Taiwanna Richardson, described the man as wearing a hood over his head, wearing
baggy blue jeans, being approximately six feet tall, and weighing about 160
pounds. 

On the night of the shooting, Mathews gave a statement to
the police. By his own admission, Mathews omitted material information from
this initial statement and was not completely truthful with the police. 
Initially, Mathews disclosed only that he was sitting in Merriweather=s vehicle when
someone approached and shot his friend.  Mathews later testified that, at the
time, he did not want to admit to the police that he and Merriweather had been
involved in a narcotics transaction because he feared his federal probation
might be revoked if the truth of his activities were revealed. Mathews also
testified that he did not identify appellant as the shooter because he feared
appellant would kill him if he did.  In fact, Washington spoke to Mathews
several days later, and did threaten to kill him if he talked about the
shooting. 

About a week after the shooting, Mathews provided a second
statement to the police in which he admitted to purchasing cocaine from
Merriweather at the time of the shooting.  However, Mathews still refused to
reveal the gunman=s identity because he remained intimidated
by members of the Family.  As a result of his involvement in the narcotics
transaction, Mathews=s probation was revoked and he was placed
in federal custody in April 2003. 








Several months later, in October 2003, Agents Vanessa
Walthur and Tony Davis of the Federal Bureau of Investigation (AFBI@) interviewed
Mathews about a matter unrelated to the Merriweather homicide.  However, at the
completion of this interview, Mathews indicated that he wanted to discuss the
Merriweather homicide.  Because Merriweather had been a witness in a federal
trial, these two FBI agents previously  had interviewed Mathews about
Merriweather=s murder.  After conducting their own independent
investigation, the agents determined that Merriweather=s murder was not
related to the federal case.  Mathews felt that because he was in federal
custody, he could safely reveal the identity of the gunman who had fatally shot
Merriweather and he informed the agents that appellant had shot and killed
Merriweather. 

The FBI agents contacted Sergeant Clarence Douglas, with
the Houston Police Department, who was the homicide investigator in charge of
the Merriweather murder, and informed him that Mathews wanted to speak to him
in regard to the shooter=s identity.  Sergeant Douglas then met
with Mathews, who told him that appellant shot Merriweather and Washington
drove the get-away vehicle.  

After his meeting with Mathews, Sergeant Douglas obtained a
photograph of appellant and placed it in a photospread to be viewed by Jimmie
Evans, a police officer employed by Precint One. Evans happened to be pumping
gas at the Race Track gas station on the night of the Merriweather murder and
witnessed the shooting.  After hearing the first shot, Evans had looked in the
direction of the McDonalds and caught a glimpse of the gunman=s face. Evans
testified that although the shooter was wearing a hood, there was nothing
covering his face and from Evans= position about
thirty yards away, he could see the shooter=s face.  After
viewing the photospread, Evans positively identified appellant as the gunman,
saying he was one hundred percent certain of his identification.  

Appellant was arrested and charged with the offense of
capital murder.  He pleaded Anot guilty.@  The jury found
appellant guilty of the charged offense, and the trial court imposed an
automatic life sentence. 

 








II.  Issues and Analysis

A.      Was appellant denied
effective assistance of counsel during the guilt-innocence phase of trial? 

In ten of his appellate issues, appellant raises various
arguments relating to ineffective assistance of counsel.  More specifically, in
issues one through nine, and twelve, he contends that he was denied effective
assistance of counsel in the following respects: 

(1)     His trial counsel failed to object to the
continued hearsay identification of appellant as the shooter by Sergeant
Douglas, which allegedly denied appellant the right of confrontation. 

(2)     His trial counsel failed to object to the
State=s questioning of Sergeant Douglas
as to whether he disbelieved Mathews=s statements that he could not make a positive
identification of the shooter, and whether he believed Mathews=s final statement that appellant
shot Merriweather. 

(3)     His trial counsel questioned Sergeant
Douglas concerning whether Sergeant Douglas had any doubt as to whether
appellant was the individual who shot Merriweather. 

(4)     His trial counsel failed to object on
hearsay grounds to the testimony of Sergeant Douglas concerning appellant=s gang membership and the positions
of the different gang members and denied appellant the right of confrontation.

(5)     His trial counsel failed to object to the
continued hearsay identification of appellant as the shooter by FBI Agent
Walthur as such identification allegedly was the result of hearsay information
which denied appellant the right of confrontation. 

(6)     His trial counsel failed to object to the
State=s questioning of FBI Agent Walthur
as to whether she disbelieved Mathews= initial denial of being able to make a positive
identification of the shooter, and whether she believed Mathews=s final statement that appellant
shot Merriweather. 

(7)     His trial counsel failed to object to the
State=s questioning of FBI Agent Walthur
concerning appellant=s membership in a gang known as Athe Family,@ and to the nickname he earned in
that gang as such information was allegedly based solely on hearsay which
denied appellant the right of confrontation. 

(8)     His trial counsel failed to object to the
State=s questioning of FBI Agent Walthur
concerning what she learned about the general characteristics of criminal
activity in appellant=s gang as that information is not
relevant to any issue of appellant=s  guilt, and was totally based upon hearsay statements
received from Mathews, which denied appellant the right of confrontation. 








(9)     His trial counsel failed to object to FBI
Agent Tony Davis=s testimony concerning Mathews=s identification of appellant as
being credible. 

. . .

(12)    His trial
counsel failed to request a continuance to investigate allegedly potentially
exculpatory items revealed in FBI Agent Walthur=s notes during
trial. 

Both the
United States and Texas Constitutions guarantee an accused the right to
assistance of counsel. U.S. Const. amend.
VI; Tex. Const. art. I, ' 10; Tex. Code Crim. Proc. art. 1.051 (Vernon 2005).  This right
necessarily includes the right to reasonably effective assistance of counsel.  Strickland
v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984); Ex
parte Gonzales, 945 S.W.2d 830, 835 (Tex. Crim. App. 1997).  To prove
ineffective assistance of counsel, appellant must show that (1) trial counsel=s representation fell below an
objective standard of reasonableness, based on prevailing professional norms;
and (2) there is a reasonable probability that the result of the proceeding
would have been different but for trial counsel=s deficient performance.  Strickland,
466 U.S. at 688B92.   Moreover, appellant bears the burden of proving his
claims by a preponderance of the evidence.  Jackson v. State, 973 S.W.2d
954, 956 (Tex. Crim. App. 1998). 








In assessing appellant=s claims, we apply
a strong presumption that trial counsel was competent.  Thompson v. State,
9 S.W.3d 808, 813 (Tex. Crim. App. 1999).  We presume counsel=s actions and
decisions were reasonably professional and were motivated by sound trial strategy.
 See Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). 
When, as in this case, there is no proper evidentiary record developed at a
hearing on a motion for new trial, it is extremely difficult to show that trial
counsel=s performance was
deficient.  See Bone v. State, 77 S.W.3d 828, 833 (Tex. Crim. App.
2002).  If there is no hearing or if counsel does not appear at the hearing, an
affidavit from trial counsel becomes almost vital to the success of an
ineffective-assistance claim.  Stults v. State, 23 S.W.3d 198, 208B09 (Tex. App.CHouston [14th
Dist.] 2000, pet. ref=d).  The Court of Criminal Appeals
has stated that it is a rare case in which an appellate court finds ineffective
assistance on a record that is silent as to counsel=s trial strategy.   See Andrews v.
State, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005).  On such a silent record,
this court can only find ineffective assistance of counsel if the challenged
conduct was A>so outrageous that no competent attorney would have
engaged in it.=@  Goodspeed v. State, 187 S.W.3d 390, 392 (Tex. Crim.
App. 2005) (quoting Garcia v. State, 57 S.W.3d 436, 440 (Tex. Crim. App.
2001)).








Appellant did not file a motion for new trial in this
case.  The record is silent as to trial counsel=s strategy.    As
for appellant=s first nine issues, there is no explanation from
counsel revealing why he failed to object to certain testimony or why he
questioned Sergeant Douglas as he did.  When the record is silent as to trial
counsel=s strategy, an
appellate court may not speculate about why counsel acted as he did.  See
Toney v. State, 3 S.W.3d 199, 210 (Tex. App.CHouston [14th
Dist.] 1999, pet. ref=d).  In the absence of such testimony, it
is difficult to meaningfully address appellant=s claims.  See
Davis v. State, 930 S.W.2d 765, 769 (Tex. App.CHouston [1st
Dist.] 1996, pet. ref=d).  In this case, even if the evidence
were inadmissible, trial counsel=s failure to
object may have been part of a reasonable trial strategy.  See Stroman v.
State, 69 S.W.3d 325, 332 (Tex. App.CTexarkana 2002,
pet. ref=d) (concluding
that counsel may have chosen not to object to inadmissible incriminating
testimony from an officer in an effort to appear open and honest with the
jury); Thomas v. State, 886 S.W.2d 388, 392 (Tex. App.CHouston [1st
Dist.] 1994, pet. ref=d) (concluding that failure to object to
hearsay testimony could have been part of trial counsel=s plausible trial
strategy).  An attorney must be free to choose not to make an objection even if
she has a legal basis for doing so.  McKinny v. State, 76 S.W.3d 463,
473 (Tex. App.CHouston [1st Dist.] 2002, no pet.).  The record is
silent regarding appellant=s first nine ineffective-
assistance-of-counsel claims concerning trial counsel=s failure to make
various objections, and we conclude that the conduct challenged in these issues was not so outrageous
that no competent attorney would have engaged in it. See Goodspeed, 187
S.W.3d at 392B93;  Smith v. State, 40 S.W.3d 147, 151 (Tex. App.CTexarkana 2001, no
pet.) (concluding  counsel was not ineffective by failing to object to
inadmissible hearsay because record was silent regarding counsel=s strategy). 
Thus, appellant has not satisfied the first prong of Strickland as to
these ineffective assistance claims.

In his twelfth issue, appellant contends his trial counsel
was ineffective for failing to request a continuance to investigate potentially
exculpatory information revealed in FBI Agent Walther=s notes during
trial.  This complaint also lacks merit.  








When FBI Agent Walthur concluded her testimony, appellant=s counsel asked
her for all documents that she had used to refresh her memory.  After reviewing
the documents, appellant=s counsel informed the trial court that
one of the documents contained information that might be exculpatory.  At this
time, appellant=s counsel mentioned that he would review
this information, and depending on his ultimate conclusion, he might request a
continuation of trial to further investigate the information.  The record
contains no further mention of this information, nor does it contain any other
reference to or request for a continuance.   The record is silent as to trial
counsel=s strategy.  As
reflected by the record, it is plausible that upon further review of this
potentially exculpatory information, appellant=s trial counsel
determined that no further action was warranted, for example because upon
further reflection and investigation, the information was not potentially
exculpatory at all.  Or, perhaps trial counsel discovered that a continuance
was not necessary.  Appellant=s counsel was in the best position to make
this decision, and he has not been given an opportunity to explain his
actions.  We conclude that his failure to request a continuance in this regard was not so outrageous that no
competent attorney would have done so.  See Lee v. State, 186 S.W.3d 649,
656B57 (Tex. App.CDallas 2006, pet.
ref=d) (concluding
that because the record was silent regarding counsel=s reasons for not
requesting a continuance, reviewing court refused to find counsel deficient for
failing to ask for a continuance to combat the introduction of unexpected
incriminating evidence);  In re B.T., 154 S.W.3d 200, 205‑06 (Tex.
App.CFort Worth 2004,
no pet.) (stating that A[b]y not presenting the issue in a motion
for new trial and developing a record of ineffective behavior, the proponent of
the claim has a difficult burden to overcome because the challenged action
might be considered sound trial strategy.@).  Therefore,  appellant has not
satisfied the first prong of Strickland as to these ineffective-
assistance claims.           

Having failed to meet the first prong of the Strickland
standard with respect to every ineffective-assistance claim asserted, appellant
cannot be successful on these issues.  Accordingly, we overrule appellant=s issues one
through nine and twelve. 

B.      Did the
trial court err in denying appellant=s Batson challenges
to the State=s peremptory strikes of two black
veniepersons?    

In his tenth issue, appellant contends the trial court
should have granted his Batson challenges to the State=s peremptory
strikes against two venirepersons: Ms. Denton (Juror number three) and Ms.
Green (Juror number fifteen).   Appellant contends the State struck these
potential jurors because they were African-Americans. 

The authority for appellants= challenges is
found in the United States Supreme Court=s holding in
Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).   In
Batson, the Supreme Court explained that the United States Constitution Aprohibits all
forms of purposeful racial discrimination in the selection of jurors.@  Id. at
88, 106 S.Ct. at 1718, 90 L.Ed.2d at 82.  Under Batson, a prosecutor
cannot use a peremptory strike against a venireperson solely on account of
race.   Id. at 89, 106 S.Ct. at 1719, 90 L.Ed.2d at 83.   In Batson,
the Court laid out a three‑step test to evaluate objections to peremptory
challenges: 

Step 1: The opponent of the challenge must make out a prima facie case
of racial discrimination. 

Step 2: If a prima facie case is made, the burden of production shifts
to the proponent of the strike to come forward with a race‑neutral reason
for exercising the strike.

Step 3: If a race‑neutral
explanation is given, then the trial court must decide whether the opponent of
the strike has proved purposeful discrimination.








Simpson
v. State, 119 S.W.3d 262, 268 (Tex. Crim. App. 2003).  Regarding the second step,
the State=s race-neutral reason for the strike need not be
persuasive, or even plausible, but only facially valid.  Purkett v. Elem, 115
S.Ct.1769, 1771 (1995).  Unless a discriminatory intent is inherent in the
explanation, the reason offered will be deemed race-neutral. Id. 

The State offered the following explanations for exercising
its peremptory strikes on Ms. Denton and Ms. Green: 

[Appellant=s counsel]:        Juror 3 Ms.
Denton and Juror No. 15 Ms. Green. 

[The Court]:                     3
and 15. 

[Appellant=s counsel]:        Yes Your Honor. 
Ms. Brown was outside. Juror No. 55 she was outside and she was 55 and we
stopped at 54. 

[The Court]:                     Okay.
So 3 and 15. 

[Appellant=s counsel]:        Correct. 3 and
15. 

[The Court]:                     And
your reason for exercising preemptories [sic] on 3 and 15? 

[The State]:                      On
juror No. 3 there were a few reasons.  Some of her answers were inaudible.  I
was asking some questions.  I wasn=t clear on which ones she was answering but on jury
information part she filled inCshe left most of it blank.  She wasn=t willing to provide the Court with
any information.  Work phone number, employer, how long, spouse=s name, spousal occupation, how
long, marital status.  We struck other jurors for the same reasons that they
had left too many blanks on juror information card.  State just considers it
too much of a wild card not to know too much about them and then juror No. 15
while I think she disqualified herself on the Fifth Amendment but then yet went
back and back tailed and was saying how the lawyers is the voice of the
Defendant and there were some other issues with regard toC








[The State]:                      On
the questioning of her he was trying to explain the presumption of innocence
and I believe the question was something like if the State didn=t present any evidence on the
verdict be a fairly obvious question the answer to which wasCwell membersCabout five seconds of silence
indicating that she did not understand basic principle of law after it had been
discussed by the Court, by the State and by the Defense to the extent that Mr.
Glover had to turn to another person on the panel who gave the correct answer. 
So our belief is that she=s going to have a problem with some basic legal
concepts just based on the fact that on the right not to testify cause she
clearly was headed in the direction that she was going to disqualify herself so
much that the Court had to ask her a question to clarify and she seemed like
she had to switch around. 

[The Court]:                     Can
I ask some questions?

[Appellant=s counsel]:        On juror No. 15
weren=t there other people who hesitated
on answering questions as well that were not struck from the jury panel by the
State? 

[The State]:                      Not
that I=m aware of.  She didn=t seem to understand the basic
legal concept.  There were some out of the strike range but I had notes those
weren=t following the questions, my
question, or your questions that are not paying attention or unable to answer.
Those persons were struck. 

[Appellant=s counsel]:        Okay. 

[The Court]:                     Anything
else?

[Appellant=s counsel]:        Nothing else.

[The Court]:                     I=m going to deny
your motion. All right. 








(Emphasis
added).  We conclude that the State provided race-neutral explanations for
exercising peremptory strikes on venirepersons Denton and Green, and the trial
court did not err in denying appellant=s Batson challenges. 
See Satterwhite v. State, 858 S.W.2d 412, 423B24 (Tex. Crim.
App. 1993) (stating that a venireperson=s failure to
complete the juror information card is a race-neutral justification for
striking the venireperson); Chiles v. State, 57 S.W.3d 512, 516B18 (Tex. App.CWaco 2001, pet. dism=d, untimely filed)
(concluding that a venireperson=s inability to understand legal principles
is a race-neutral justification for striking venireperson); Godine v. State,
874 S.W.2d 197, 205 (Tex. App.CHouston [14th Dist.] 1994, no writ.)
(holding failure to complete information card a race-neutral reason); Davis
v. State, 796 S.W.2d 813, 819 (Tex. App.CDallas 1990, writ
ref=d) (concluding
that juror=s appearance and demeanor are valid race neutral
reasons for exercising a peremptory strike);  C.E.J. v. State, 788
S.W.2d 849, 857 (Tex. App.CDallas 1990, writ denied) (stating that a
venireperson=s inattentiveness may be a sufficiently race‑neutral
reason to justify the use of a peremptory strike); York v. State, 764
S.W.2d 328, 331 (Tex. App.CHouston [1st Dist.] 1988, writ ref=d) (striking
minority venireperson due to her occupation as a social worker is race‑neutral
explanation).  Accordingly, we overrule appellant=s tenth issue. 

C.      Did the
trial court err by allowing FBI Agent Walthur to testify that appellant=s nickname is AIce?@

In his eleventh issue, appellant contends the trial court
erred in overruling his trial counsel=s objection to
statements by the State=s witness, FBI Agent Walthur, concerning
nicknames for members of the Family and, specifically, to her testimony that
appellant=s nickname is AIce.@  Appellant
asserts on appeal that this testimony constitutes inadmissible hearsay.

A failure to raise a specific objection during trial will
waive error in the admission of evidence.
Tex. R. App. P. 33.1(a); see also Martinez v. State, 22 S.W.3d
504, 507 (Tex. Crim. App. 2000) (stating that Ato preserve error
regarding the admission of evidence, a defendant must lodge a timely and
specific objection . . . to give to the trial court . . . the opportunity to
correct the error@ ); Miranda v. State, 813 S.W.2d
724, 737 (Tex. App.CSan Antonio 1991, pet. ref=d) (reiterating
that a timely, specific objection is required to preserve a complaint for
appellate review).  Although appellant objected when the State asked FBI Agent
Walthur to identify Washington=s nickname, he failed to raise an
objection when she revealed appellant=s nickname a few
questions later.  Appellant=s objection at trial did not  specifically
direct the trial court=s attention to which particular statement
by Agent Walthur he claimed was inadmissible, and thus appellant failed to
preserve his complaint for appellate review. 








In any event, any error in admitting the statements was
harmless because two other witnesses (Mathews and FBI Agent Tony Davis)
referred to appellant by his nickname, Ice, after Agent Walthur had testified. 
See Ethington v. State, 819 S.W.2d 854, 860 n. 8 (Tex. Crim. App.
1991) (holding that when counsel objects to certain inadmissible testimony, but
then permits similar evidence to come in without objection, any error is deemed
harmless); Ross v. State, 154 S.W.3d 804, 812 (Tex. App.CHouston [14th
Dist.] 2004, no pet.) (stating that any error in witness=s reference to
defendant by his nickname, Thug, was cured when subsequent witnesses referred
to him by his nickname).  Accordingly, we overrule appellant=s eleventh issue. 

D.      Did the
trial court err in failing to rule on appellant=s objections made
during Mathews=s testimony? 

In his thirteenth issue, appellant argues the trial court
erred in failing to rule on several of his objections made during Mathews=s testimony.  In
order to preserve this type of complaint for appellate review, one must object
in the trial court to the judge=s failure to rule on objections.  See
Geuder v. State, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); Whitmore v.
State, 183 S.W.3d 522, 531 (Tex. App.CHouston [14th
Dist.] 2006, no pet. h.).  Though appellant made several objections during
Mathews=s testimony, he
but did not object to the trial court=s failure to rule
on them.  To avoid waiver, appellant either had to secure an adverse ruling at
a time when the trial judge could correct the problem by ruling on the matter
or issuing an instruction to the jury, or he had to object to the judge=s failure or
refusal to rule on the objection.  Without an adverse ruling or an objection to
the trial court=s failure to rule, there is no error
preserved for our review.  See Geuder, 115 S.W.3d at 13.  Accordingly,
appellant has waived his complaint, and we overrule his thirteenth issue.

Having overruled all of appellant=s issues on
appeal, we affirm the trial court=s judgment.                                                                       

 

/s/      Kem Thompson Frost

Justice

 

Judgment
rendered and Memorandum Opinion filed March 6, 2007.








Panel
consists of Justices Fowler, Edelman, and Frost.

Do Not
Publish C Tex. R. App. P. 47.2(b).









[1]  Appellant and Mathews were members of the Family. 
The members paid monthly dues to the group leader (Washington).