**v.**

**The STATE of Texas, Appellee.**

**No. 10–94–350–CV.**

Court of Appeals of Texas,
Waco.

May 1, 1996.

Robert N. Udashen, Milner, Lobel, Goranson, Sorrels, Udashen & Wells, Dallas, for appellant.

Joe F. Grubbs, County & District Attorney, Cynthia W. Hellstern, Asst. County & District Attorney, Waxahachie, for appellee.

Before CUMMINGS and VANCE, JJ.

## OPINION

PER CURIAM.

A jury found beyond a reasonable doubt that R.X.F., who was fifteen at the time of the offense and sixteen at the time of trial, committed delinquent conduct by intentionally or knowingly causing his sexual organ to penetrate the mouth of a female child, who was younger than fourteen at the time of the offense. TEX.PENAL CODE ANN. § 22.021 (Vernon Supp.1996). Following a disposition hearing, the jury assessed a determinate sentence of twenty years. TEX.FAM.CODE ANN. § 54.04 (Vernon 1996). R.X.F. brings thirteen points of error, attacking the trial court's jurisdiction, the legal and factual sufficiency of the evidence, the court's *Batson* rulings, waiver of certain rights, and several of the court's evidentiary rulings in his first twelve points. He raises an ineffective assistance of counsel claim in his final point. We will affirm.

## JURISDICTION

We will first address the question of the trial court's jurisdiction, which is raised in point three. R.X.F. contends that the Family Code denies jurisdiction in determinate-sentence proceedings to "county courts"

and that, because the county court and the statutory county court at law in Ellis County have coextensive jurisdiction in juvenile matters, the county court at law in Ellis County lacked jurisdiction to hear this determinate-sentence proceeding. Thus, R.X.F. alleges, the order of disposition and judgment are void.

The State concedes that the original petition was filed in the county court, but contends that the Family Code required the proceeding to be transferred to the county court at law once the grand jury had approved the petition. Moreover, the State points out that the county court at law in Ellis County has concurrent jurisdiction with the district court in family law cases.

A county's juvenile board may designate one or more courts in the county as the juvenile court, but if the board designates the constitutional county court, then it must designate at least one other court as a juvenile court. *Id.* § 51.04(b), (c). The juvenile board in Ellis County has designated its constitutional county court and the county court at law as juvenile courts. A constitutional county court, however, does not have jurisdiction of a juvenile proceeding involving a petition approved by a grand jury. *Id.* § 51.04(c). This accounts for the proceeding being transferred to the county court at law after the grand jury approved the petition in this case.

The county court at law in Ellis County has concurrent jurisdiction with the district court in family cases and proceedings. TEX. GOV'T CODE ANN. § 25.0722(a) (Vernon Supp. 1996). Thus, it has jurisdiction over this matter. We overrule point three.

## SERVICE OF SUMMONS

■ R.X.F. contends in point four that the court erred when it began his adjudication hearing on the same day that he was served with a summons and a copy of the State's amended petition. Section 53.06 requires the court to direct a summons to the child named in the petition. TEX.FAM.CODE ANN. § 53.06(a)(1). Section 53.07 provides that, if the person to be served is in the state, "the summons shall be served upon him personal-

ly at least two days before the day of the adjudication hearing." *Id.* § 53.07(a).

The State filed its original petition on September 16, 1993, and R.X.F. was served with a summons and a copy of the petition on October 11. On August 22, 1994, the court began voir dire and selected twelve jurors for this proceeding, but did not formally swear and empanel the jurors until August 25, just before it began taking testimony. The State filed an amended petition on August 22, the day voir dire began, and R.X.F. was served with another summons along with a copy of the amended petition on that date. The original and amended petitions are identical, except that in the amended petition the State alleged that R.X.F. committed the aggravated sexual assault in Dallas County rather than Ellis County. R.X.F. and his counsel expressly waived the right to have the amended petition approved by the grand jury. *Id.* § 53.045.

R.X.F. argues that the court began his adjudication hearing on August 22, the day jury selection started, not on August 25, when the court commenced the evidentiary portion of the proceeding. Thus, he contends, the court erred when it began the adjudication hearing on the same day he was served with the summons and amended petition.

As noted above, the original petition and summons were served on R.X.F. in October 1993, many months prior to the August 1994 adjudication hearing. Essential to R.X.F.'s contention in point four is the assumption that the law required the court to direct a second summons to him when the State amended its original petition. None of the provisions relating to the filing of a petition or the issuance and service of a summons expressly require the court to direct a summons to a juvenile when the original petition is amended. *Id.* §§ 53.04, 53.06, 53.07. Thus, one cannot reasonably argue that the legislature intended such a requirement from the language in the relevant sections of the Family Code.

■ Service of the original petition and summons is sufficient to confer jurisdiction over the cause on the juvenile court. *B.R.D. v. State,* 575 S.W.2d 126, 130 (Tex.Civ.App.—

Corpus Christi 1978, writ ref'd n.r.e.). The State may amend its petition "at such time, and under such circumstances, as to be basically fair to the minor." *Carrillo v. State*, 480 S.W.2d 612, 615 (Tex.1972). After service of the original petition, the juvenile is protected by this requirement, not by the service provisions. Thus, we will not read into the statute a requirement that the State serve the minor with a copy of an amended petition at least two days prior to the beginning of an adjudication hearing as long as the amendment to the petition satisfies *Carrillo*. *Id.*; TEX.FAM.CODE ANN. § 53.07(a). In our view, whether the juvenile received a copy of an amended petition more than two days before the start of trial is a relevant consideration in evaluating the "basically fair to the minor" requirement but is not, in and of itself, a requirement. *See B.R.D.*, 575 S.W.2d at 130. Point four is overruled.

## WAIVER OF TEN DAYS TO PREPARE

Section 51.10(h) provides: "Any attorney representing a child in proceedings under this title is entitled to 10 days to prepare for any adjudication or transfer hearing under this title." TEX.FAM.CODE ANN. § 51.10(h). R.X.F.'s fifth point is that the court erred when it commenced the adjudication hearing without first obtaining a waiver of this right to have ten days to prepare for trial on the amended petition from him personally even though his attorney specifically waived any such right and elected to proceed without further delay.[1]

■ Considering section 51.10(h)'s plain language, the legislature intended to grant to the *attorney*, not the child, the entitlement to request ten days for trial preparation. If the legislature had intended to bestow the entitlement on the child (defendant), it could have expressly done so. *See* TEX.CODE.CRIM. PROC.ANN. art. 28.10(a) (Vernon 1989) ("On the request of the defendant, the court shall allow the defendant not less than 10 days, or a shorter period if requested by the defendant, to respond to the amended indictment

or information."). We refuse to expand the entitlement in section 51.10(h) to a juvenile under the guise of statutory interpretation.

Section 51.09 governs the waiver of "any right *granted to a child*" by the Family Code or the federal and state constitutions. TEX. FAM.CODE ANN. § 51.09(a) (emphasis added). Under our interpretation of section 51.10(h), the court did not have to obtain R.X.F.'s waiver of the ten-day entitlement in addition to that of his counsel. The record reflects that counsel waived the ten days' preparation time. Thus, the court did not err when it proceeded without a formal waiver from R.X.F. Point five is overruled.

## PEREMPTORY STRIKES

The State used six of its ten peremptory strikes against minority members of the venire. R.X.F. complains about four of those strikes in points six through nine, alleging that the State used the strikes in a racially discriminatory manner and that the court thus erred when it denied a motion to discharge the array. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

### BATSON IN A JUVENILE PROCEEDING

Before turning to the merits of R.X.F.'s complaints, we offer this preface for our determination of the *Batson* questions:

■ This is a civil proceeding with pronounced criminal overtones. TEX.FAM.CODE ANN. §§ 53.045, 54.03, 54.04; *Matter of S.C.*, 790 S.W.2d 766, 770 (Tex.App.—Austin 1990, writ denied) (holding that a determinate-sentence adjudication, although civil in nature, is substantively a determination of whether the juvenile has violated any one of six specific provisions the Texas Penal Code). The principles of *Batson* are applicable to civil proceedings. *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *Powers v. Palacios*, 813 S.W.2d 489, 490 (Tex.1991) (per curiam). At least one Texas court has expressly extended the protection of *Batson* to a juvenile proceeding. *C__E__J__ v. State*, 788 S.W.2d

---

**1.** This argument necessarily assumes that the filing of an amended petition triggered the entitlement under this section and that the Family Code granted the entitlement to a juvenile. We

do not reach the question of whether the filing of the amended petition entitled R.X.F.'s counsel to an additional ten days to prepare.

849, 852 (Tex.App.—Dallas 1990, writ denied). Our view is that the state can no more deny a juvenile equal protection of the law in a determinate-sentence proceeding than it can an adult in a criminal proceeding.

However, the Texas Supreme Court has yet to develop its own *Batson* case law. Justice Gonzalez has suggested that, in the absence of its own precedents, the Court should look to the decisions of the Texas Court of Criminal Appeals for guidance on *Batson* issues. *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 151 n. 3 (Tex.1995) (Gonzalez, J., concurring). Considering the quasi-criminal nature of this civil proceeding, we will act on Justice Gonzalez's suggestion and apply the case law of the United States Supreme Court and that developed by our state's highest criminal court and intermediate appellate courts in criminal proceedings.

The procedural steps and the parties' respective burdens are outlined in many opinions. *E.g. Satterwhite v. State*, 858 S.W.2d 412, 423 (Tex.Crim.App.), *cert. denied*, 510 U.S. 970, 114 S.Ct. 455, 126 L.Ed.2d 387 (1993); *Vargas v. State*, 838 S.W.2d 552, 553 (Tex.Crim.App.1992). Although the burden of production shifts between the parties, the defendant always retains the ultimate burden of persuasion, *i.e.*, the burden of proving that the allegations of purposeful discrimination are true. *Purkett v. Elem*, —— U.S. ——, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995); *Tompkins v. State*, 774 S.W.2d 195, 202 (Tex.Crim.App.1987), *aff'd*, 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989) (without opinion by an equally divided Court).

Once the *Batson* objections were made, the court asked the State to give the reasons for striking the prospective jurors, and the prosecutor responded by stating the reason for each strike. This removed any question of whether R.X.F. had discharged his initial burden of making a prima facie showing of purposeful discrimination. *Hill v. State*, 827 S.W.2d 860, 865 (Tex.Crim.App.), *cert. denied*, 506 U.S. 905, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992). All reasons stated were facially race-neutral. *Purkett*, —— U.S. at ——, 115 S.Ct. at 1771 ("Unless a discriminatory intent is inherent in the prosecutor's

explanation, the reason offered will be deemed race neutral."). At this point, the court became the fact-finder, with the responsibility of weighing the evidence and determining whether R.X.F. had established purposeful discrimination. *Young v. State*, 826 S.W.2d 141, 145 (Tex.Crim.App.1991); *Tompkins*, 774 S.W.2d at 202. The trial judge, as supervisor of the voir dire, is presumably the best situated to detect any problems in the voir dire process, including any disparate treatment of members of the panel. *Young*, 826 S.W.2d at 144. Here, after listening to voir dire, hearing the reasons for the strikes, and considering R.X.F.'s in-court responses to the prosecutor's explanations, the court overruled the *Batson* objections and denied a defense motion to discharge the jury.

Our task is to review the court's rulings under the "clearly erroneous" standard, considering the record of voir dire, the racial makeup of the venire, the prosecutor's explanations, and the appellant's rebuttal and impeaching evidence. *Vargas*, 838 S.W.2d at 554. In discharging our duty, we are mindful that the court's rulings are entitled to great deference on appeal. *Id.* Moreover, we will consider the evidence in the light most favorable to the court's rulings in determining whether they are supported by the record. *Id.* at 553.

VENIREMAN ZAVALA

During voir dire, the prosecutor extensively questioned individual members of the venire about their feelings and beliefs concerning the ability of a young child to concoct a story of sexual abuse and then persist in the story throughout the trial of the alleged abuser. (The victim in this case was approximately seven years old at the time of the offense.) This generally involved questions about each juror's experience with his or her own children, children's fantasies, a child's ability to differentiate between telling the truth and the consequences of telling a lie, and the factors each prospective juror would consider important in judging the credibility of the young victim.

■ The following excerpts from the *Batson* hearing set forth the State's reason for striking Fernando Zavala, a Hispanic, and R.F.X.'s response to the strike:

THE COURT: .... What's your reason on Fernando Zavala?

. . . . .

[PROSECUTOR]: And he said he would have to know the child [victim] *personally* before he'd be able to know if they were being truthful.

. . . . .

[DEFENSE COUNSEL]: This is a male individual. He has three children, married. To be honest with you, Judge, but just ... about every one of them out there, during the State's voir dire, said that it was hard to believe a child could lie about this [allegation of sexual abuse]. I don't know if that's a justification [for the strike], that's what I'm hearing, but that's not the reason why this individual was struck. And I believe it's for the reason this individual's Hispanic and my client's Hispanic.

[PROSECUTOR]: .... But the reason why Mr. Zavala was struck was because of his inability for me to be able to actually know one of the State's chief witnesses *personally* in order ... for him to accept her testimony....

THE COURT: Yeah. I remember him making that statement, so I'll let you strike him.

(Emphasis added).

However, the record reflects that the prosecutor may have misinterpreted Zavala's answers to the State's questions on voir dire:

[PROSECUTOR]: Mr. Zavala, can you add anything to the discussion that we've been having about children and their truthfulness?

JUROR ZAVALA: Yes, ma'am. You have to know the child—you have to know their background.

[PROSECUTOR]: ... Why is that important?

JUROR ZAVALA: You have to know the person. You have to know enough about them.

[PROSECUTOR]: Do you feel that in a courtroom situation, that you would be able to learn enough about a child to determine whether or not they are truthful?

JUROR ZAVALA: I'd have to hear it.

[PROSECUTOR]: Okay. What are the types of things in their background would you, as a potential juror in this case, be looking for to determine whether or not a child was worthy of being believed?

JUROR ZAVALA: Whether they had any problems before or not.

[PROSECUTOR]: What types of problems?

JUROR ZAVALA: Whether they'd had any counseling or anything like that or any type of school problems.

Thus, there is a potential variance between Zavala's responses on voir dire and what the prosecutor and the court apparently remembered him saying.

On appeal, R.X.F. first points out that Zavala's answers during voir dire do not indicate that he would have to know the child-victim *personally* before he could assess her credibility. Next, because Zavala's responses were very similar to those of two other panel members (Duckworth and Murray), both of whom served on the jury, he argues that the prosecutor treated Zavala in a disparate manner. To cast doubt on the verity of the prosecutor's stated reason, R.X.F. notes that the prosecutor even used Zavala's answers as a predicate for questioning one other member of the venire:

[PROSECUTOR].... Now, [JUROR MURRAY,] ... would you agree with Mr. Zavala that you would need to know something about the child's background to determine whether or not they were telling the truth?

JUROR MURRAY: Yes, and their parents. Their morality would have a lot to do with it.

Thus, R.X.F. insists, the prosecutor's stated reason for removing Zavala was only a pretext for a racially motivated strike.

■ A prosecutor must state race-neutral explanations for any peremptory strike that is challenged under *Batson*. *Vargas*, 838

S.W.2d at 553. By its rulings, the trial court implicitly found the prosecutor's explanations to be race neutral. *Id.* at 556. There is an apparent discrepancy between Zavala's actual responses and the prosecutor's interpretation of his responses, as reflected in the explanation for the strike. However, this discrepancy is not "great enough to amount to a pretense on [its] face" and, thus, does not automatically compel the conclusion that the prosecutor's explanation was a mere sham or pretext for purposeful discrimination. *Francis v. State,* 909 S.W.2d 158, 164 (Tex.App.—Houston [14th Dist.] 1995, no pet.); *Straughter v. State,* 801 S.W.2d 607, 614 (Tex.App.—Houston [1st Dist.] 1990, no pet.).

 R.X.F. is entitled on appeal to rely upon a comparative analysis of the panel members to support his argument that the prosecutor engaged in disparate treatment of white and minority jurors, even though he failed to present the analysis to the trial court at the *Batson* hearing. *Vargas,* 838 S.W.2d at 556; *Young,* 826 S.W.2d at 145–46. However, nothing in the record indicates the race of the jurors that were not challenged by the State. Absent some indication that the jurors R.X.F. attempts to compare Zavala's treatment with are not minorities themselves, R.X.F.'s claim that the prosecutor exercised her peremptory challenges based on race is not benefited by showing "disparate treatment" of these individual veniremen. *See id.*

 For R.X.F. to prevail on this point, we must be left with a "definite and firm conviction that a mistake has been committed." *Vargas,* 838 S.W.2d at 554 (quoting *Hernandez v. New York,* 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991)). Because the trial court heard Zavala's responses and interpreted them the same way the prosecutor did, and because R.X.F. has not shown that the State treated any similarly situated majority veniremen differently than it did Zavala, we are not convinced that the clearly erroneous test has been met, *i.e.,* we are not convinced that a mistake has been made. *Id.* Thus, we overrule point six.

VENIREMAN MEJORADO

 Point seven relates to the peremptory strike against Refugio Mejorado, a Hispanic. The record reflects the following:

THE COURT: What's your reason [for striking Mejorado]?

[PROSECUTOR]: Your Honor, I have written down on my notes that this man thinks that a child can make up a story and not—and carry it forward. He believes that a five-year-old can make up a story and not believe they are lying.

[DEFENSE COUNSEL]: Your Honor, I think all the—this is the way I saw the voir dire during the State's examination. Most of the jurors felt like the child could make up a story of this nature. And during the defense voir dire most of the jurors felt like they could probably—possibly they could make up a story of this nature. Most all of the jurors had that opinion.

THE COURT: That's the only reason on Mejorado?

[PROSECUTOR]: Yes. But you'll notice that there were Hispanic people that were maintained by the State of approximately the same age and, you know, below and above him.

THE COURT: Tell me again what you think Mejorado said, now.

[PROSECUTOR]: He—he said that he thinks that a child can make up a lie and believe—and believe it. He believes that a child will make up a story of sexual abuse and take it to court. And this is—

THE COURT: And you're saying that you've got other jurors that are right there next to that other one?

[PROSECUTOR]: Right. And said that they didn't think that a child could make up a story of sexual abuse and take it to court.

[DEFENSE COUNSEL]: I think—if I can respond to that, Judge, I think the—that may have been some distinction made up during the State's voir dire, but during the defense voir dire they basically said, well, yeah, there's a possibility, but just like Mr. Mejorado said, that there's a possibility that the child could make up a story like that and carry it out.

THE COURT: Well, to me, that's a non— nonrace bias. I'll let her do that [*i.e.,* strike him].

The reason given for striking Mejorado is facially race neutral. *Purkett,* —— U.S. at ——, 115 S.Ct. at 1771. On appeal, however, R.X.F. argues that the State subjected Mejorado to disparate treatment because a comparison of his responses to those of Jean Consalus, who served on the jury, shows that their answers were virtually the same. The record does reflect some similarity between Mejorado's and Consalus' responses on the ability of a five-year-old child to make up a story and then come to believe the story as the truth. However, as the prosecutor indicated, Mejorado also agreed with the statement that "a child could make up an allegation of sexual abuse and continue on with their story through all of the legal process until it came to court", while Consalus committed herself to the position that she didn't "think that a child can make up a story at that age like this, in this case." Also, again there is no indication of Consalus' race. As above, R.X.F. cannot make out a *Batson* claim relying on a comparative analysis without also showing that the comparison veniremen are not minorities. *Vargas,* 838 S.W.2d at 556; *Young,* 826 S.W.2d at 145–46.

Because R.X.F. has not shown disparate treatment of similarly situated veniremen, we will not disturb the court's finding that the facially race neutral reason for the State's strike is not a pretext. *Vargas,* 838 S.W.2d at 554. We overrule point seven.

Venireman Price

■ Point eight relates to the peremptory challenge against Gertrude Price, a black member of the venire. The prosecutor claimed that she struck Price because she lived in the same neighborhood as the defendant and the victim's family and, further, because Price believed "that children tell the truth most of the time, but that a good liar sticks to the story." Each of the reasons is facially race neutral. *Purkett,* —— U.S. at ——, 115 S.Ct. at 1771. R.X.F. questioned whether Price's address on Lariat Trail in the city of Red Oak was in the same general neighborhood as R.X.F.'s and J.W.'s Lariat Trail addresses in the city of Ovilla. However-

er, the court found that Price actually resided a block away from R.X.F. and J.W., because Lariat Trail is one street, with opposite sides of the street being in one city or the other. At the *Batson* hearing R.X.F. presented no evidence to contradict the prosecutor's explanation in this regard.

Viewing the record in the light most favorable to the court's ruling and granting due deference to the ruling on appeal, the court's implied finding that the prosecutor did not engage in purposeful discrimination when she struck Price based on her address is supported by the record and, thus, is not clearly erroneous. Having upheld a race-neutral basis for the strike, we do not reach the question of whether the second reason stated for striking Price was also race neutral. *See Hill,* 827 S.W.2d at 866. Point eight is overruled.

Venireman Richardson

■ R.X.F.'s ninth point is that the court erred when it allowed the State to strike Samuel Richardson, an African–American. The prosecutor stated that she struck Richardson because he "said that young children could be swayed by their parents to make up a story like this [involving sexual abuse] and that's what I anticipate one of the defense issues is going to be in this case. . . . He said . . . that children can be swayed by their parents and become confused." R.X.F. never made any response to the strike. The explanation offered by the prosecutor is facially race-neutral. *Purkett,* —— U.S. at ——, 115 S.Ct. at 1771.

R.X.F.'s entire argument on appeal, however, is that Richardson "was obviously speaking from his (and undoubtedly numerous [others']) life experience. It is hard to imagine that this reason for striking Mr. Richardson was anything but pretextual." Again, considering the record as a whole and viewing the evidence in the light most favorable to the ruling, the court's implied finding that the prosecutor did not engage in purposeful discrimination in striking Richardson is supported by the record and is, likewise, not clearly erroneous. *Vargas,* 838 S.W.2d at 553. We overrule point nine.

## LEGAL SUFFICIENCY OF THE EVIDENCE

■ The jury found that on or about May 15, 1993, R.F.X. "knowingly or intentionally [caused] the penetration of the mouth of a child, to-wit: [J.W.], by his sexual organ and that the victim was then and there a child younger than fourteen (14) years of age at the time of the offense and that [R.X.F.] did thereby commit delinquent conduct." In point one, he questions the legal sufficiency of the evidence to support a finding that he committed aggravated sexual assault. Tex.Penal Code Ann. § 22.021. R.X.F. preserved this complaint in a motion for a new trial. *Matter of M.R.*, 858 S.W.2d 365, 365 (Tex.1993), *cert. denied,* — U.S. —, 114 S.Ct. 894, 127 L.Ed.2d 87 (1994).

■ "The requirements governing an appeal [of an order of a juvenile court] are as in civil cases generally." Tex.Fam.Code Ann. § 56.01(b). However, the State is both constitutionally and statutorily required to prove the allegations in its petition beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 368, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368 (1970); Tex.Fam.Code Ann. § 54.03(f). As a matter of federal constitutional due process, an adjudication of delinquent conduct cannot stand on evidence constituting less than proof beyond a reasonable doubt. *Winship*, 397 U.S. at 368, 90 S.Ct. at 1075. Thus, we are required to apply the due process standard for testing the legal sufficiency of the evidence articulated by the U.S. Supreme Court in *Jackson v. Virginia:* "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *P.L.W. v. State*, 851 S.W.2d 383, 387 (Tex.App.—San Antonio 1993, no writ). The civil "no evidence" standard, specifically rejected in *Jackson*, does not provide constitutionally sufficient review of the legal sufficiency of the evidence and may not be used in the context of an appeal from an adjudication proceeding. *See Jackson*, 443 U.S. at 320, 99 S.Ct. at 2789; *see also King v. State*, 895 S.W.2d 701, 709 (Tex. Crim.App.1995) (Meyers, J., dissenting); *but see C.F. v. State*, 897 S.W.2d 464, 472 (Tex. App.—El Paso 1995, no writ); *Matter of M.R.*, 846 S.W.2d 97, 99–100 (Tex.App.—Fort Worth 1992), *writ denied per curiam*, 858 S.W.2d 365 (Tex.1993), *cert. denied,* — U.S. —, 114 S.Ct. 894, 127 L.Ed.2d 87 (1994).

■ Viewing the evidence in the light most favorable to the verdict, as we must, we find that the State presented the testimony of J.W., the victim of the offense. She testified that she was nine years old at the time of the trial, had been in second grade in May 1993, and had never been married. She knew R.X.F. because her father had hired him to paint a fence on their property. At the end of one day, after she had led him to a creek behind the house so that he could clean up, R.X.F. asked if she wanted to play a trick. When she agreed, he instructed her to get down on her knees, close her eyes tight, tilt her head back, and open her mouth. After she complied, he told her that he was going to put a piece of candy in her mouth and that she was to "suck on it." However, instead of candy, R.X.F. put something that was "round, squishy", "warm" and "had a bad taste" in her mouth. It caused her to "gag" and when she opened her eyes, although she did not see what had been in her mouth, she saw R.X.F. "pulling and straightening his pants." J.W. indicated how big the object felt for the jury using her finger and thumb. She believed that he had put "his private" into her mouth. When asked, she stated that she did not think it could have been his finger. R.X.F. told her not to tell anybody what he had done.

D.W., J.W.'s mother, also testified. She stated that J.W. told her what had happened a few weeks after the incident. J.W. told her because R.X.F. had suggested that they "play the trick" again.

This evidence is sufficient for a rational trier of fact to find beyond a reasonable doubt that R.X.F. committed the offense of aggravated sexual assault. Tex.Penal Code Ann. § 22.021(a)(1)(B)(ii), (a)(2)(B); *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. Point one is overruled.

## FACTUAL SUFFICIENCY
## OF THE EVIDENCE

■ By point two, R.X.F. challenges the factual sufficiency of the evidence to show that he committed aggravated sexual assault. Tex.Penal Code Ann. § 22.021. He argues that there are "simply too many inconsistencies and impossibilities in [J.W.]'s story." This complaint was also properly preserved in the motion for new trial. *M.R.*, 858 S.W.2d at 366. In ruling on this claim, we "view the evidence as a whole to determine whether the State met its burden of proof beyond a reasonable doubt." *Matter of G.M.P.*, 909 S.W.2d 198, 202 (Tex.App.—Houston [14th Dist.] 1995, no writ). Only if the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust will we conclude that the State failed to carry its burden. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *see also Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996). If we are to sustain this point, we must be able to clearly state in this opinion how the evidence is factually insufficient such that the verdict is clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986); *Clewis*, 922 S.W.2d at 135–36.

■ After examining the evidence presented at trial, we cannot say that the jury's verdict is contrary to the overwhelming weight of the evidence. R.X.F. argues that (1) J.W. testified she did not see R.X.F.'s penis even though she claimed he put it in her mouth; (2) he and his relatives testified that he was out of town on the date J.W. claimed that he approached her the second time; (3) he would not have gone to the creek to wash off because he had been instructed to use paint thinner to clean up; (4) the evidence suggested that J.W. had concocted the incident in an attempt to "one-up" a friend who claimed R.X.F. had put a paintbrush in her mouth under similar circumstances; and (5) R.X.F. emphatically denied that the incident occurred. R.X.F.'s complaints go to the jury's evaluation of the credibility of the witnesses both for and against him. Although he has pointed out difficulties with some testimony, those difficulties are not sufficient to show that jury's finding is clearly wrong and unjust. *Cain*, 709 S.W.2d at 176; *Clewis*, 922 S.W.2d at 129. Therefore, we overrule point two.

## HEARSAY TESTIMONY

D.W. called the police after J.W. told her about the assault. Officer Rick Austin of the Ovilla Police Department interviewed J.W. At trial, he was allowed to testify, over R.X.F.'s hearsay objection, that J.W. told him that she thought R.X.F. had put his penis in to her mouth. In point ten, R.X.F. argues that the court erred when it overruled his hearsay objection and allowed this testimony.

■ We agree with R.X.F. that Officer Austin's testimony was hearsay and the court should have sustained his objection. Tex.R.Civ.Evid. 802; *Burks v. State*, 876 S.W.2d 877, 898 (Tex.Crim.App.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *Perez v. State*, 678 S.W.2d 85, 87 (Tex.Crim.App.1984). However, we conclude that the court's error was harmless because the testimony was cumulative to other properly admitted evidence, and it was not emphasized by the State after it was admitted. *Burks*, 876 S.W.2d at 898; *Brown v. State*, 649 S.W.2d 160, 163 (Tex. App.—Austin 1983, no pet.); *Wilmeth v. State*, 634 S.W.2d 732 (Tex.App.—Dallas 1982, no pet.). Because we conclude that the error was harmless, we overrule point ten. Tex.R.App.P. 81(b)(1).

## WAIVER OF THE PRIVILEGE
## AGAINST SELF–INCRIM-
## INATION

■ R.X.F. testified in his own defense during his case in chief. By point eleven, he argues that the court should have obtained a written or on-the-record waiver of his right against self-incrimination prior to allowing him to testify. Tex.Fam.Code Ann. § 51.09(a). However, "it is well established that when an accused voluntarily takes the stand he waives his privilege against self-incrimination." *Brumfield v. State*, 445 S.W.2d 732, 735 (Tex.Crim.App.1969); *Cuba*

*v. State*, 905 S.W.2d 729, 733 (Tex.App.—Texarkana 1995, no pet.). R.X.F. has not cited any authority which requires an explicit waiver of his right to avoid self-incrimination to satisfy section 51.09 and we have found none. Thus, we conclude that the waiver implied by his voluntarily taking the stand in open court when called by his lawyer to testify on his own behalf complies with the "waiver ... in court proceedings that are recorded" provision of the Family Code. TEX.FAM.CODE ANN. § 51.09(a)(4). Point eleven is overruled.

## REBUTTAL TESTIMONY

The State called D.W. to the stand to testify during its rebuttal presentation. Her testimony, in pertinent part, was as follows:

Q: And we've established through previous testimony that you live across the street from [R.X.F.]?

A: Yes.

Q: And this trial began on Monday when we selected the jury, Monday, August 22nd?

A: Yes.

Q: And it was set for trial to begin on Thursday, I mean, on Wednesday, August 24th?

A: Yes.

Q: And where were you on Wednesday night at approximately 9:30?

A: I was on my front porch sitting.

Q: Okay. And were you alone or—

A: At one time I was alone, at one time my husband was out there.

Q: Okay. All right. And where is your front porch? What—what can you see when you look out from your front porch?

A: You can see my neighbors right across the street and then I see [R.X.F.]'s driveway.

[DEFENSE COUNSEL]: I'm going to object to this line of questioning, your Honor, it's not relevant to whether or not this crime occurred or didn't occur.

THE COURT: Overruled.

Q: (By [the State]) And at approximately 9:30 on Wednesday night, did you observe some activity at [R.X.F.]'s house?

A: Yes, I did.

Q: And would you tell the jury what that activity was, please?

A: Well, my dog began to bark. So I walked outside. And I walked to the porch. And I heard and saw a flashlight. And—and [R.X.F.] and two of his friends with a blue Porsche blacktop and they were loud. I heard them. And I saw [R.X.F.] in the light—in the headlights that go to the Porsche. And I saw [R.X.F.] mocking what we did that day.

He said, "But, Judge, I didn't see anything." And his friends just began to laugh. I mean, I sat there with tears listening to this. Because we have gone to extremes—

[DEFENSE COUNSEL]: I'm going to object again, your Honor. This isn't relevant and it's—

THE COURT: Overruled. Go right ahead.

A: We've gone to extremes to the seriousness of this. And his friends and him were sitting there laughing. "[R.X.F.], we'll go testify for you." Ha ha ha, everybody was laughing.

And then [R.X.F.] says, "Sir, sir, sir." It—it was just—it was horrible.

Q: Okay. And did your—did your husband listen, too?

A: He had to leave. He was sick. He wouldn't listen to it.

In point twelve, R.X.F. argues that the court erred in overruling his objection to this testimony regarding the "totally irrelevant conversation." However, R.X.F. testified during his defensive case in chief. During his testimony, he stated "I swear to you, to everybody in here, I did not do this. I've lost everything because of this." Two questions later, his attorney asked him "Do you need to take a break or do you want to keep on going?", and then, without a recorded response from R.X.F., requested and received a five minute break from the court. The State now argues that D.W.'s testimony was in rebuttal to R.X.F.'s "I've lost everything because of this" testimony and his accompanying demonstration of grief.

"[R.X.F.]'s character as a witness was in issue the minute he took the stand." *Pyles v. State*, 755 S.W.2d 98, 115 (Tex.Crim. App.), *cert. denied*, 488 U.S. 986, 109 S.Ct. 543, 102 L.Ed.2d 573 (1988). Thus, he could be impeached just as any other witness. *Mock v. State*, 848 S.W.2d 215, 220 (Tex. App.—El Paso 1992, pet. ref'd). As a general rule, a witness may not be impeached on a collateral matter, *i.e.*, a matter which the cross-examining party would not be entitled to prove as part of his case in chief. *Ramirez v. State*, 802 S.W.2d 674, 675 (Tex. Crim.App.1990). However, "when an accused testifies gratuitously as to some matter that is irrelevant or collateral to the proceeding, as with any other witness he may be impeached by a showing that he has lied or is in error as to that matter." *Hammett v. State*, 713 S.W.2d 102, 105 (Tex.Crim.App. 1986); *House v. State*, 909 S.W.2d 214, 216 (Tex.App.—Houston [14th Dist.] 1995, pet. filed). Evidence concerning such collateral matters is designed to invoke the permissible inference that "if the accused lied or was in error as to a collateral matter ... he is likely to have lied or been in error in the balance of his testimony." *Hammett*, 713 S.W.2d at 105. The testimony from D.W. was *relevant* to R.X.F.'s credibility as a witness to demonstrate that he was not as grief stricken as his testimony indicated, thus creating the permissible inference that if he lied about the impact of the accusations and the trial on him, he may have lied in his denial of the offense itself. *See id.* Point twelve is overruled.

## ASSISTANCE OF COUNSEL

In point thirteen, R.X.F. complains about the adequacy of his trial attorney's representation. He claims that "trial counsel failed on numerous occasions to object to inadmissible evidence and improper statements by the prosecutor [and] pursued a strategy that was clearly not the result of reasonable professional judgment."

Initially, we expressly recognize that a juvenile is entitled to effective assistance of counsel in an adjudication proceeding. The child has both a statutory and due-process right to assistance of counsel. Tex. Fam.Code Ann. § 51.10; *see In re Winship*, 397 U.S. at 368, 90 S.Ct. at 1075; *In re Gault*, 387 U.S. 1, 34–42, 87 S.Ct. 1428, 1447–51, 18 L.Ed.2d 527 (1967); *C___E___J___*, 788 S.W.2d at 852. The constitutional right to assistance of counsel invokes an accompanying right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984); *M.B. v. State*, 905 S.W.2d 344, 345–46 (Tex. App.—El Paso 1995, no writ). Thus, R.X.F.'s complaint raises a recognized right. *M.B.*, 905 S.W.2d at 345.

Because R.X.F.'s claim is cognizable under the federal constitution, we will utilize the constitutional standard announced by the U.S. Supreme Court, as applied by the Texas Court of Criminal Appeals to the Texas bifurcated-trial structure. *Strickland*, 466 U.S. at 686–87, 104 S.Ct. at 2064; *Chambers v. State*, 903 S.W.2d 21, 32 & n. 16 (Tex.Crim. App.1995); *Hernandez v. State*, 726 S.W.2d 53, 56–57 (Tex.Crim.App.1986). R.X.F. complains only about his counsel's conduct during the adjudication phase of his trial; therefore, we apply the standard applicable to the guilt-innocence phase of a criminal trial. Tex.Fam.Code Ann. §§ 54.03(a), 54.04(a); *Craig v. State*, 825 S.W.2d 128, 129–30 (Tex. Crim.App.1992).

Thus, to prevail on his claim, R.X.F. must show by a preponderance of the evidence that his lawyer's representation fell below an objective standard of reasonableness and that but for counsel's deficient performance, the result of the proceedings would have been different. *Chambers*, 903 S.W.2d at 32; *Garcia v. State*, 887 S.W.2d 862, 880 (Tex.Crim.App.1994), *cert. denied*, ── U.S. ──, 115 S.Ct. 1368, 131 L.Ed.2d 223 (1995). Although R.X.F. is required to point out the specific acts and omissions which he alleges support his complaint, we measure counsel's performance by the "totality of the representation," not by isolated acts or incidents in the record. *Rodriguez v. State*, 899 S.W.2d 658, 665 (Tex. Crim.App.1995); *Garcia*, 887 S.W.2d at 880. We must indulge a strong presumption that counsel exercised reasonable professional judgment when making all significant decisions. *Strickland*, 466 U.S. at 689–90, 104

S.Ct. at 2065–66; *Jackson v. State,* 877 S.W.2d 768, 771 (Tex.Crim.App.1994).

DEFENSIVE STRATEGY

■ R.X.F. complains about his trial counsel's defensive strategy. He bases his complaint on two witnesses called by the defense—K.A., J.W.'s thirteen-year-old baby sitter and M.W., J.W.'s father—and two witnesses not called by the defense—R.X.F's friends who were involved in the mid-trial conversation outside of R.X.F.'s home.

He claims that the evidence adduced from K.A. and D.W. was more damaging than helpful to his defense and his lawyer did not consider the consequences of calling these witnesses before he put them on the stand. However, there is nothing in the record to suggest that counsel did not carefully consider the decision to call these witnesses; thus, we must presume that the decision was made in the exercise of reasonable professional judgment. *Id.; Jones v. State,* 900 S.W.2d 392, 398 (Tex.App.—San Antonio 1995, pet. ref'd) ("We have no authority to speculate about possible unsound trial strategies or lack of strategies.").

■ R.X.F. also complains about his counsel's failure to call the participants in the alleged mid-trial conversation. He submitted affidavits from R.X.F.'s mother and his two friends in this regard with his motion for a new trial. R.X.F.'s mother alleges in her affidavit that "[R.X.F.] and I gave [the trial attorney] the names and phone numbers for [R.X.F.'s friends], so that [the trial attorney] could have [them] testify in court and explain the conversation that [D.W.] claims to have overheard." Again, however, the record is silent as to why these witnesses were not called. *Id.* Additionally, R.X.F.'s mother's affidavit does not state when the names and phone numbers were provided to the attorney and we will not presume that they were timely delivered. *Rodriguez,* 899 S.W.2d at 665; *Garcia,* 887 S.W.2d at 880; *Jackson,* 877 S.W.2d at 768.

UNMADE OBJECTIONS

■ R.X.F. identifies twelve instances of testimony where he claims that his counsel failed to raise an objection when R.X.F. thinks he should have. For four of the twelve complaints, R.X.F. has failed to point out where in the record the allegedly objectional testimony may be found. Because he has the burden of identifying the acts and omissions by his counsel that support his complaint, we decline to search the record for the testimony he objects to now. *Id.* Thus, we will not consider the unmade objections relating to testimony to which he failed to direct us in the statement of facts. *Id.;* TEX.R.APP.P. 74(f).

■ R.X.F. argues that his lawyer should have objected to testimony from four witnesses: the first witness testified that the witness believed that J.W. was telling the truth, had told the same story to the police and knew that it was a penis in her mouth; the second stated that the information provided by J.W. and her family to the police was sufficient to file charges on and the investigation was properly handled; the third witness told the jury that J.W. was a very truthful person; finally the fourth testified that J.W. would not repeat her allegations if they were not true and that J.W. would not manufacture such a story.

However, the record is silent as to why counsel failed to object to this testimony. In the face of the strong presumption that counsel's failure to object was the product of reasonable professional judgment, we will not speculate as to his reasons, or lack thereof, for not making the objections. *Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065–66; *Jackson,* 877 S.W.2d at 771; *Gamble v. State,* 916 S.W.2d 92, 93 (Tex.App.—Houston [1st Dist.] 1996, no pet.). In this instance, we cannot hold that counsel could not have had a plausible trial strategy which would have supported his actions. *See Owens v. State,* 916 S.W.2d 713, 719 (Tex.App.—Waco 1996, no pet.).

Finally, R.X.F. complains that his lawyer failed to object to a comment during the prosecutor's opening statement that the investigating officer believed that J.W. was telling the truth. Again, the record is silent as to counsel's reasons, or lack thereof, for not making an objection and we will not supply the missing information by specula-

tion. *Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065–66; *Jackson,* 877 S.W.2d at 771; *Gamble,* 916 S.W.2d at 93.

The record is silent as to why the objections R.X.F. argues should have been made were not; thus, R.X.F. cannot overcome the strong presumption that his lawyer exercised reasonable professional judgment in not raising the objections. *Id.* To conclude that counsel's performance was deficient for failing to object to the testimony would require us to speculate, which we will not do. *Id.* Likewise, R.X.F. has not shown that the decision to call or not call witnesses was not carefully considered by counsel. Again, he asks us to speculate regarding the motivation for these decisions, which we decline to do. *Id.; Jones,* 900 S.W.2d at 398. Because there is no evidence in the record to rebut the presumption of effective assistance, we overrule point thirteen.

## DISPOSITION

Because we have overruled all of R.X.F.'s points of error, we affirm the judgment.